Grand Island Banking Co. v. Costello.

GRAND ISLAND BANKING COMPANY, APPELLANT, V.
JAMES A. COSTELLO ET AL., APPELLEES.

FILED MAY 21, 1895.   No. 6179.

1. Garnishment of Mortgagee of Chattels: LEVY OF EXE-
CUTION: ATTACHMENT. By garnishment of a mortgagee in
possession of mortgaged chattels such chattels are placed in
custody of the law and thenceforward are no more subject to
actual seizure and appropriation to the satisfaction of another
execution or writ of attachment than if they had actually been
levied upon when the garnishment took place.

2. Chattel Mortgages: FRAUDULENT CONVEYANCES: GARNISH-
MENT. The validity of a mortgagee's right to chattels held in
his actual possession by virtue of his mortgage may be called
in question by a garnishing creditor alleging and proving fraud,
as well as by an actual levy on the chattels in defiance of the
claims of such mortgagee.

3. Executions: VALIDITY OF LEVY. The test of the validity of
a levy upon personal property is whether or not the acts of the
officer under his writ have been such as would make him liable
as trespasser but for the protection afforded by such writ.

4. Chattel Mortgages: EXCESSIVE SECURITY: EVIDENCE:
FRAUDULENT CONVEYANCES. The disproportion, if one exists,
between the value of chattels mortgaged and the amount
thereby secured affords no basis for a presumption of law. It
is a matter of evidence to be accorded such weight as in the
light of surrounding circumstances it is entitled to receive in
the determination of a question of fact.

APPEAL from the district court of Hall county. Heard
below before HARRISON, J.

The opinion contains a statement of the case.

*Abbott & Caldwell,* for appellant:

The decree canceling appellant's mortgage should be set
aside. The only lien on the mortgaged property superior
to that of appellant is the claim for city and county taxes.

The mortgage is not invalid on the ground that the security is excessive. (*Grimes v. Farrington*, 19 Neb., 44; *Smith v. Boyer*, 35 Neb., 46; *Hershiser v. Higman*, 31 Neb., 531; *Whitney v. Levon*, 34 Neb., 443; *First Nat. Bank of Denver v. Lowrey*, 36 Neb., 291; *Thompson v. Richardson Drug Co.*, 33 Neb., 714; *Nelson v. Garey*, 15 Neb., 531; *Bierbower v. Polk*, 17 Neb., 268; *Davis v. Scott*, 22 Neb., 154; *Ward v. Parlin*, 30 Neb., 376; *Puckett v. Richardson Drug Co.*, 20 S. W. Rep. [Tex.], 1127; *Elwood v. May*, 24 Neb., 373; *Rothell v. Grimes*, 22 Neb., 526; *Leffel v. Schermerhorn*, 13 Neb., 342; *Shelley v. Heater*, 17 Neb., 505; *Downs v. Kissam*, 10 How. [U. S.], 102.)

After the appellant was garnished the property was in the custody of the law and not subject to execution or attachment. (*Northfield Knife Co. v. Shapleigh*, 24 Neb., 635; *Ryan v. Parris*, 48 Kan., 765.)

The following cases were cited as to priority of liens: *Chicago Lumber Co. v. Fisher*, 18 Neb., 334; *People v. Bristol*, 35 Mich., 28.

*M. B. Reese*, also for appellant:

The decisions that guided the court below in finding that appellant's mortgage was void have recently been overruled. (*Jones v. Loree*, 37 Neb., 816; *Kilpatrick v. McPheely*, 37 Neb., 800; *Farwell v. Wright*, 38 Neb., 445; *Kavanaugh v. Oberfelder*, 37 Neb., 647; *Costello v. Chamberlain*, 36 Neb., 45; *Whitney v. Levon*, 34 Neb., 443; *Sherwin v. Gaghagen*, 39 Neb., 238.)

*Charles G. Ryan*, for Hall county and other appellees:

The lien for taxes is superior to all others. (*Binkert v. Wabash R. Co.*, 98 Ill., 205; *Ream v. Stone*, 102 Ill., 359; *Kirkwood v. Magill*, 6 Kan., 540.)

The levies that were made, subject to appellant's mortgage, with consent of the mortgagee, were valid. (*Evans v.*

*Warren*, 122 Mass., 303; *Wisser v. O'Brien*, 44 How. Pr. [N. Y.], 209; *Nelson v. Ferris*, 30 Mich., 497.)

*Charles B. Keller*, for Wood, Brown & Co.:

The security taken by the appellant is excessive and the mortgage is therefore void. (*Thompson v. Richardson Drug Co.*, 33 Neb., 714; *Brown v. Work*, 30 Neb., 800; *Russell v. Lau*, 30 Neb., 209; *Bonns v. Carter*, 20 Neb., 566; *Morse v. Steinrod*, 29 Neb., 108; *White v. Cotzhausen*, 129 U. S., 343.)

The failure to register the mortgage made it fraudulent as to creditors. (*Simon v. Openheimer*, 20 Fed. Rep., 555; *Goll v. Miller*, 54 N. W. Rep. [Ia.], 443; *Steele v. Coon*, 27 Neb., 586; *Pond v. Skidmore*, 40 Conn., 213; *Standard Paper Co. v. Guenther*, 67 Wis., 101; *Sanger v. Freie Press Co.*, 41 N. W. Rep. [Wis.], 436; *Crippen v. Jacobson*, 56 Mich., 386; *Feary v. Cummings*, 41 Mich., 383; *Dyer v. Thornstead*, 29 N. W. Rep. [Minn.], 345.)

The creditors who levied subject to the mortgage are estopped from disputing its validity. (*Simon v. Openheimer*, 20 Fed. Rep., 555; *Russell v. Dudley*, 3 Met. [Mass.], 147; *Tolbert v. Horton*, 31 Minn., 518; *Howard v. Chase*, 104 Mass., 249; *Tuite v. Stevens*, 98 Mass., 305.)

As to what is necessary to constitute a levy see *Johnson v. Walker*, 23 Neb., 744; *Knap v. Sprague*, 9 Mass., 258; *Townsend v. Corning*, 40 O. St., 335; *Haggerty v. Wilber*, 16 Johns. [N. Y.], 287; *Lowry v. Coulter*, 9 Pa. St., 349; *Logsdon v. Spivey*, 54 Ill., 104; *Dresser v. Ainsworth*, 9 Barb. [N. Y.], 619; *Newman v. Hook*, 37 Mo., 207; *Duncan's Appeal*, 37 Pa. St., 500; *Standard Oil Co. v. Bretz*, 98 Ind., 231; *Westervelt v. Pinckney*, 14 Wend. [N. Y.], 123; *Bryan v. Bridge*, 6 Tex., 141; *Allen v. McCalla*, 25 Ia., 464; *Lane v. Jackson*, 5 Mass., 163; *Learned v. Vandenburgh*, 7 How Pr. [N. Y.], 379; *Dworak v. More*, 25 Neb., 739.

As to priority of liens the following cases were cited:

*Loring v. Melendy*, 11 O., 355; *Neal v. Foster*, 36 Fed. Rep., 29; *Smith v. Lind*, 29 Ill., 30.

*Walter J. Lamb*, for W. S. Peck & Co.:

A creditor may attack the title of the garnishee to property or effects of the debtor whenever the garnishee holds the same under a transfer fraudulent as to creditors. (*Blue Valley Bank v. Bane*, 20 Neb., 294; *Cowles v. Coe*, 21 Conn., 220; *Lamb v. Stone*, 11 Pick. [Mass.], 527; *Henry v. Murphy*, 54 Ala., 246; *Eyerman v. Krieckhaus*, 7 Mo. App., 455.)

The possession of property by the mortgagee under a mortgage of chattels after default, and the right he has over the goods, are utterly inconsistent with the possession of such goods at the same time by the sheriff under execution. (*McConnell v. Denham*, 34 N. W. Rep. [Ia.], 298; *Chicago Lumber Co. v. Fisher*, 18 Neb., 334; *Townsend v. Corning*, 40 O. St., 335; *Rickards v. Cunningham*, 10 Neb., 417; *Chittenden v. Rougers*, 42 Ill., 105; *Sparks v. Compton*, 70 Ind., 393.)

All creditors who levied their attachments and executions subject to the bank mortgage recognized its validity, and until it was attacked by third parties were conclusively estopped from denying the validity of the mortgage, and so they are postponed to the levy by garnishment of W. S. Peck & Co. (*Kellogg v. Secord*, 3 N. W. Rep. [Mich.], 868; *Nelson v. Ferris*, 30 Mich., 499.)

When creditors pursue different remedies each is entitled to the precedence in law given under the remedy selected by him. (*Rockhill v. Hanna*, 15 How. [U. S.], 189.)

*Fowler, Smith & Musgrave*, for John V. Farwell & Co.:

The creditors who failed to attach or garnish are not in a position to assail the mortgage. After garnishment the property was *in custodia legis*. The creditors who attempted to levy execution, in violation of the rights of the mortgagee

and those who attached and garnished, acquired no lien on the property. (*Healey v. Butler*, 66 Wis., 9; *Luckland v. Garsch*, 56 Mo., 267; *Henry v. Murphy*, 54 Ala., 246; *Coble v. Nonemaker*, 78 Pa. St., 501; *Shaver Wagon & Carriage Co. v. Halsted*, 43 N. W. Rep. [Ia.], 623; *Johnson v. Hersey*, 73 Me., 291; *Morris v. House*, 32 Tex., 492; *Brainard v. Van Kuran*, 22 Ia., 261; *Sperry v. Gallaher*, 77 Ia., 107; *Strohm v. Hayes*, 70 Ill., 41; *First Nat. Bank of Stevens' Point v. Knowles*, 67 Wis., 373; *Cornish v. Russell*, 32 Neb., 297.)

Those who garnished have a valid lien. (*Northfield Knife Co. v. Shapleigh*, 24 Neb., 635.)

The equity in mortgaged chattels in possession of the mortgagee can only be reached by garnishment. (*Peckinbaugh v. Quillin*, 12 Neb., 586; *Brunham v. Doolittle*, 14 Neb., 214; *Chicago Lumber Co. v. Fisher*, 18 Neb., 338.)

*W. H. Thompson*, for Cushing, Olmstead & Snow and others, as to the effect of appellant's failure to file its mortgage, cited: *Hildreth v. Sands*, 2 Johns. Ch. [N. Y.], 35; *Hughes v. Cory*, 20 Ia., 399; *Blannerhassett v. Sherman*, 105 U. S., 100; *Walton v. First Nat. Bank*, 22 Pac. Rep. [Col.], 440; *Steele v. Coon*, 27 Neb., 597; *McQuade v. Rosecrans*, 36 O. S., 442; *Russell v. Winne*, 37 N. Y., 593.

*W. H. Platt*, for Tootle, Hosea & Co.

*Hall, McCulloch & English*, for Steppacher, Arnold & Co.

*R. R. Horth* and *J. H. Woolley*, for other appellees.

Ryan, C.

This action was brought on February 11, 1891, in the district court of Hall county by the Grand Island Banking Company against James A. Costello, sheriff of said county, and the firms of Wood, Brown & Co. and Steppacher, Arnold & Co., to restrain the levy of an execution issued

on a judgment rendered in favor of each of the firms named against Charles A. Wiebe. The property consisting of a stock of dry goods, carpets, clothing, etc., was in the possession of the Grand Island Banking Company by its agent, J. W. Thompson, under a chattel mortgage previously made by Wiebe, the owner thereof, to said banking company. Prior to the attempted levies many suits had been begun against Wiebe, aided by attachments, under which the banking company had been garnished. There also had been commenced proceedings in aid of execution against Wiebe. By consent of the banking company there were alleged levies of executions in favor of various judgment creditors of Wiebe, made subject to the above chattel mortgage by J. W. Thompson aforesaid, claiming in making such levies to be acting in the capacity of deputy sheriff. The statements of appellant as to the number, description, and amounts of the processes which issued against Wiebe are not questioned, and therefore these descriptions will be accepted as correct for the purposes of this general statement, rather than to resort to an actual count, comparison, and computation for the purposes of accurate verification. The mortgage was made on February 4, possession thereunder was taken the next day, and before another day the mortgagee was garnished on claims to the amount of $2,412.61, followed the next day by garnishments to the amount of $4,063.38. There issued from the county court sixty-six executions for the collection of different sums, amounting in the aggregate to $23,312.60. From the district court two attachments and garnishments issued for $10,673.44. There issued from the county court three attachments and garnishments amounting to $517.66, and four garnishments in aid of executions to the amount of $3,863.55. The firm of Wood, Brown & Co. and the firm of Steppacher, Arnold & Co. on the 10th of February, 1891, notwithstanding existing garnishments of the mortgagee and the claims of existing levies expressly

subject to the mortgage, required an actual levy by seizure of certain mortgaged property to be made by the sheriff, which brought on this litigation. Subsequently every other creditor of Wiebe seems to have been made a party defendant, and thenceforward there were united efforts, under pleadings in the nature of cross-petitions, to set aside the mortgage above referred to, and, severally, each claimant sought to appropriate as large a proportion of the mortgaged property as possible. We are relieved of the necessity of passing upon the right to resort to these proceedings by a stipulation during the trial of the case in this language: "It is agreed between the parties to this suit that the entire controversy touching the property of Charles A. Wiebe, and the right of the parties thereto in this suit, shall be finally determined by the court in this action." (*Vide Sherwin v. Gaghagen*, 39 Neb., 238.) While this cause was pending in the district court the merchandise mortgaged was sold on foreclosure proceedings for $23,700. There was on final hearing a decree which postponed the mortgage of the banking company to all claims except those of Wood, Brown & Co. and Steppacher, Arnold & Co. The garnishments were held entitled to priority over the several levies attempted upon the property described in the mortgage, and superior to the rights of all creditors was declared the right to collect the taxes due from Wiebe; and the banking company was required to distribute the proceeds of the foreclosure sale as above indicated.

1. On behalf of Wood, Brown & Co. and Steppacher, Arnold & Co., counsel for these two firms in argument say that on February 6, 1891, the stock mortgaged was in possession of the mortgagee; that the only attempts of the sheriff to levy had been, in terms, subject to the interest of the Grand Island Banking Company under its mortgage; that no actual seizure of any portion of the property was in fact made under any writ, the levy in each instance being simply indorsed as made in the manner above indi-

cated. The nature of the levies in favor of the two firms just indicated first became known to their attorneys on February 6, whereupon these attorneys, as they now state, recognizing that these levies were ineffectual and inadequate, being mere pen and ink levies, and an attempt to levy a writ upon a mere equity, upon demand indemnified the sheriff and demanded that he take manual possession of a sufficient amount of Wiebe's goods to satisfy the two aforesaid claims. This the sheriff was proceeding to do on February 10, when this suit was commenced to enjoin the making of such seizure and levy, as well as the removal of the property or interference with the possession or control of the bank over the same. As there had previously been several garnishments of the Grand Island Banking Company there are presented by the contentions of Wood, Brown & Co. and Steppacher, Arnold & Co. two questions, one of which is, the effect of the alleged levies previously made; the other, what rights had been acquired by garnishments of the banking company. It was held by the district court that illegality of the mortgage could be attacked by garnishing creditors of Wiebe by alleging and proving fraud, whether the writs of garnishment were issued on attachments or after judgment, and that a like attack might be instituted by a levy on the goods of an execution or attachment, if made regardless of the mortgage. It is important that there should be kept in remembrance the fact that the mortgagee was, at the time of all the occurrences now under consideration, in the actual, undisputed possession of the property sought to be affected. There were alleged levies thereon which consisted merely in minuting that such levies were made in each instance subject to the mortgage of the Grand Island Banking Company. One of the important rights of the banking company was the right to maintain undisturbed the possession which it then held. For making such an alleged levy the banking company could not maintain an action of any kind whatever

against the sheriff. The test of the validity of a levy upon
personal property is whether or not the acts of the officer
under his writ have been such as would make him liable
as a trespasser but for the protection afforded by the writ.
(*Westervelt v. Pinkney*, 14 Wend. [N. Y.], 123; *Bryan v.
Bridge*, 6 Tex., 141; *Allen v. McCalla*, 25 Ia., 464.)  It
sometimes happens that while, in fact, a levy is invalid, an
officer by his return may be estopped to deny its validity;
but even this is not true in this instance. As against the
alleged levies expressly subject to the mortgage of the
Grand Island Banking Company in possession an actual
levy of the writs in favor of Wood, Brown & Co. and Step-
pacher, Arnold & Co. would have created the better lien
upon the property mortgaged. The alleged levies subject
to the mortgage of the Grand Island Banking Company
formed no basis for a contest with that company, for the
return, which alone justified the attaching creditor's inter-
ference with the property, prohibited such interference as
against rights conferred by the mortgage.

In this case the question of the most practical impor-
tance to Wood, Brown & Co. and Steppacher, Arnold & Co.
is whether or not the existing garnishments of the Grand
Island Banking Company conferred rights over which
the levy of an attachment on behalf of either of said two
firms could not prevail. In *Faulkner v. Meyers*, 6 Neb.,
414, LAKE, C. J., said: "There were several instructions,
requested by the plaintiffs in error, refused. These re-
lated to the right of an ordinary creditor by attachment to
subject the interest of a mortgagor of goods and chattels in
the hands of the mortgagee to the payment of his debt. As
abstract propositions of law these instructions were in the
main correct, but having no application to the case on trial
were very properly refused. There is no doubt, however,
that the equity of redemption in property so circumstanced
may be reached by attachment. The plain orderly course
to pursue in such case is by garnishment, whereby whatever

may remain of the mortgaged goods beyond that which shall be found necessary to satisfy the mortgage debt and interest and the costs of sale can be ordered paid over to the attachment creditor." In *Peckinbaugh v. Quillin,* 12 Neb., 586, LAKE, C. J., said: "The claim of the plaintiffs in error that the mortgagor had an interest in the mortgaged property subject to sale on execution, and, therefore attachable, cannot be sustained." In *Burnham v. Doolittle,* 14 Neb., 214, the holding in *Peckingbaugh v. Quillin* was qualified to the extent that it was held that the interest which a mortgagor of chattels might have in them might be reached by seizure under a writ of attachment at any time while in his possession, and by means of the process of garnishment if they had passed into the hands of the mortgagee. In *Chicago Lumber Co. v. Fisher,* 18 Neb., 334, REESE, J., said of the language used by LAKE, C. J., in the case of *Burnham v. Doolittle, supra:* "If by this language the learned judge intended to say that, under all circumstances, where property is in the possession of the mortgagor an execution or order of attachment may be levied upon the property itself and the property sold, the mortgagee being thus, in many instances, wholly deprived of his security, we cannot agree with him. But if he intended to say that the interest—*i. e.,* the equity of redemption—might be seized upon as an interest, then we should not differ, perhaps." In the cases thus far reviewed there was considered only the proper method of procedure where there existed no intention to question the validity of the mortgage under which the garnishee was in possession. In *Reed v. Fletcher,* 24 Neb., 435, COBB, J., used this language: "Drake, in his valuable work on Attachments at section 251, sixth edition, says: 'So it has been held that garnishment has the effect to place the property in the garnishee's hands in the custody of the law, and that an officer has no right after the garnishment to take the property from the garnishee.' To this he cites three cases. The two first fully sustain the text; the third,

being out of the library, has not been examined." The volume referred to as being out of the library has been returned, and an examination of the third case cited by Drake is found to be equally in point with the other two. In *Northfield Knife Co. v. Shapleigh*, 24 Neb., 635, the case of *Reed v. Fletcher, supra*, was cited with approval, and it was furthermore held, if necessary to render effectual the garnishment, that a receiver would be appointed. It may now be accepted as being without question the law of this state, that, by garnishment of a mortgagee in possession of chattels mortgaged, such chattels are placed *in custodia legis*, and that thenceforward the possession of the garnishee cannot be interfered with by a direct levy of an execution or writ of attachment upon the property in the hands of the garnishee so as to postpone the rights of the party in whose favor the garnishment had been made. As between the attachment and execution creditors who secured garnishments on the one hand, and the firms of Wood, Brown & Co. and Steppacher, Arnold & Co. and such creditors of Wiebe as procured levies subject to the interest of the Grand Island Banking Company on the other hand, the decree of the district court must stand.

2. The attachment and execution plaintiffs in whose suits against Wiebe the Grand Island Banking Company had been garnished, by their pleadings attacked the mortgage under which the agent of the Grand Island Banking Company held possession, as fraudulent in respect to creditors of the mortgagor. On the 15th day of January, 1891, Mr. Wiebe, already owing the Grand Island Banking Company about $12,000, borrowed of it $3,000 more. In the forenoon of February 4, following the above date, Mr. Wiebe called on the cashier of the banking company and urgently requested an additional loan of $5,000. In this interview it was developed that Mr. Wiebe's assets were of the value of $15,000 less than his estimate of January 15 preceding, while his liabilities were in the neighborhood of

$15,000 in excess of that estimate. The only outcome of
this conference with the cashier was that Mr. Wiebe was
requested to meet the officers of the banking company at
its office at 7 o'clock in the evening of the same day, when
Mr. Abbott, its vice president and attorney, then out of the
city, would be present. The proposed meeting took place
at the time and place designated, the representatives of the
banking company thereat being George B. Bell, cashier, and
George A. Packer, O. A. Abbott, J. W. Thompson, and
W. B. Carey, directors. The president, Mr. Peterson, was
a non-resident of this state and was absent. Mr. Wiebe
was accompanied by W. B. Coggeshall, who, in his testi-
mony, described himself as then being practical manager
under Mr. Wiebe. It is impossible to state what trans-
pired at this conference in the order of its occurrence,
though we might adopt the narrative of some particular
witness. The events will therefore be described without
special reference to their order of sequence. At first, the
request for an additional loan was presented to the officers
of the banking company and refused. Mr. Coggeshall,
then addressing Mr. Abbott, inquired if Mr. Wiebe could
not sell the stock to him (Mr. Coggeshall), taking notes
therefor, which Mr. Wiebe might indorse and turn out to
his creditors and in that way get an extension, dispose of
his store, and pay a hundred cents on the dollar. Mr.
Abbott answered: "No, sir; that cannot be done." Mr.
Abbott was then asked if a bill of sale could be made to
the banking company—turning over everything to said
company and allowing Mr. Wiebe to go ahead and close out
his own property and pay a hundred cents on the dollar.
To this Mr. Abbott answered as before, and, in further
conversation, said that whatever the nature of the security
might be, it must tell the truth on its face, so that any one
who should see it would know the exact relations of the par-
ties to it. The only proposition acceptable to the bank was
formulated by Mr. Abbott, and that was that a chattel

mortgage should be made to the banking company upon the goods and fixtures, likewise that a mortgage should be made upon certain real property.   To the question, "What would be done under the chattel mortgage if given?" the answer was, "Take possession at once and proceed to sell strictly according to law."   Both Wiebe and Coggeshall objected to this course of procedure, because thereby, they said, not more than fifty per cent of the value of the goods would be realized.   Previous to this conversation Mr. Coggeshall had stated that the stock footed up $65,000, and that Mr. Wiebe owed about $53,000, exclusive of one real estate mortgage of $8,000 and another real estate mortgage of $3,600.   When the chattel mortgage was demanded with the explanation as to what would be done with it, both Mr. Wiebe and Mr. Coggeshall asserted that the stock would not, at forced sale, bring more than from $15,000 to $18,000.   At some time while Mr. Wiebe was considering the only terms which Mr. Abbott would offer, Mr. Packer, one of the directors of the banking company, in the language of Mr. Coggeshall, "told how they treated a creditor of theirs in Troy.   He said a fellow failed and they took possession of what he had, and that in ten days they had a compromise, and they had the fellow on his feet again."   The language attributed to Mr. Packer by Mr. Coggeshall is quoted from the testimony, for, otherwise, its indefiniteness could not be fully realized.   For a like reason the language of Mr. Coggeshall, which, it is argued, disclosed a fraudulent purpose on the part of the officers of the banking company in taking security, is reproduced from the bill of exceptions.   Mr. Abbott was cross-examining, when the following interrogatories were propounded and answered:

Q.  Now, then, what was said and who said it in reference to Mr. Wiebe's creditors—protecting Mr. Wiebe from his creditors?

A.  Well, you know what you said.

Q. I want to know what was said. State what I said; that is what I want. If I said anything just state what it was.

A. Well, I have been stating it here.

Q. What was said about—you said that something was said in your direct examination in regard to helping Wiebe to a settlement with his creditors. Now, I want to know what was said and who said it; what the language was.

A. The plan was suggested by you.

Q. What was the plan that I suggested? What was my language?

A. The plan?

Q. Yes, sir.

A. That he should give a mortgage on everything that he had.

Q. For what purpose?

A. For what purpose?

Q. Yes, sir.

A. Well, to protect the bank first.

Q. Yes, sir, and what else?

A. Then to do what the other fellow—the other fellow could talk to him, not him to the other fellow.

Q. You say that I used that language?

A. I say that was the original plan of that deal.

Q. What I want to know now is what was said and who said it.

A. Who said it?

Q. Yes, and just what each man said.

A. The perfecting of that plan was by you.

Q. Well, just state what was said.

A. Well, I have stated it now as plain as it can be stated.

Q. Do you say that I said that—to protect the bank first and then to compel the creditors to come to Wiebe and not Wiebe to come to them?

A. In the general conversation I will make an affidavit—

Q. Never mind, you are on oath now. I simply asked

you a plain question whether I said those words or whether I did not?

A. Well, I will be responsible for what I say; that that meeting at the bank was for the purpose of seeing what could be done for Mr. Wiebe, and seeing if some arrangement could be provided whereby he could get an extension on his liabilities or perfect some plan whereby he could force a compromise. Now that is as plain as I can make it.

Q. Who suggested it? Where did you first hear it?

A. Where did I first hear it?

Q. Yes, sir.

A. Mr. Wiebe and I through the day consulted with the bank. Not only in the morning but in the afternoon. We consulted each other as regarded the condition of things and went there to the bank that night with the idea and with the intention of fixing some plan—I will reiterate what I have just said, whereby he could get an extension or make a compromise with his creditors.

Mr. Wiebe at the meeting of February 4 finally consented to execute to the bank the chattel mortgage and the real estate mortgage as demanded. There were then produced the existing evidences of indebtedness of Mr. Wiebe, together with an unrecorded real estate mortgage by him given to the banking company about two years before to secure such advances as should be made to him. Mr. Wiebe asked that this real estate mortgage might not be recorded, but that another should be taken in its stead because of certain reasons that he had for desiring this course to be taken. It appears that these reasons were that Mr. Wiebe had obtained credits on the faith of certain statements which ignored the existence of this mortgage rendered possible by the failure to record it. The notes of Wiebe in the bank on February 4 were three in number, one for $10,000, dated January 30, 1891, due March 1, 1891; one for $3,000, dated January 20, 1891, due March 1, 1891; and one for $1,170, dated January 30, 1891, due

March 1, 1891. There was taken from Mr. Wiebe a note for $15,792, of date February 4, 1891, payable to the banking company on demand, with ten per cent per annum interest from date, and the three above described notes were thereupon surrendered to him. Mr. Wiebe gave a chattel mortgage on his stock to secure this note, and he and his wife likewise made a real estate mortgage for the same purpose, and Wiebe then received the old unrecorded mortgage. When all this had been done Mr. Packer remarked that it was as clean a transaction as he ever saw in his whole life. After the mortgage had been given Mr. Wiebe started to leave the room, but immediately came back and said that he had two or three checks out, amounting to about $100; that he owed his clerks some money and had no ready money with which to pay them, and asked that the banking company should pay the outstanding checks and honor those he would give to his clerks. The total amount necessary for these purposes he fixed at $350, and he offered that when these payments were made to give his note for the amount, in respect to which certain notes amounting to the sum of $5,700, held by the bank for collection, should be held as collateral. This proposition was assented to and afterwards the banking company paid out about $456, instead of $350, the amount in advance estimated as being necessary for the purposes indicated. The excess in collaterals over the above amount paid out was not claimed by the bank, but was held subject to such disposition as should be made of them by the district court. On the morning following the above meeting, possession was taken of mortgaged chattels by the banking company, which, until the foreclosure sale, maintained such possession, through its agent, J. W. Thompson, except as said possession was interfered with by the attempted hostile levies of Wood, Brown & Co. and Steppacher, Arnold & Co., hereinbefore mentioned. There was evidence introduced tending to show that very soon after February 4,

1891, probably the next day, Mr. Wiebe confessed judg-
ment in the county court of Hall county in favor of the
firm of Abbott & Caldwell for the sum of $500, for serv-
ices as attorneys at law to be rendered by that firm in the
future in his behalf; that Mr. Abbott, of the above firm,
who was the attorney who, on the night of February 4,
had acted for the banking company as its vice president
and counsel, advised Mr. Wiebe what course he should
pursue with regard to certain debts he owed; that Mr.
Wiebe afterwards had desk room in the office of Abbott &
Caldwell; that Mr. Caldwell, Mr. Abbott's partner, ad-
vised Mr. Wiebe's collector to take but one or two accounts
with him at one time, for fear he should be garnished on
claims against Wiebe on some one of his collecting trips
and otherwise counseled said collector; that immediately
after the stock of Wiebe was taken into the possession of
the banking company, Wiebe's creditors were clamorous
for confessions of judgment, and that in respect to author-
izing such judgments Mr. Abbott was Mr. Wiebe's legal
adviser.   One witness testified that while so acting Mr.
Abbott, as Mr. Wiebe told witness, advised Mr. Wiebe
not to confess judgment in favor of any outside creditor.
This Mr. Abbott in his testimony denied having done.
There was evidence of grave misconduct on the part of
Mr. Wiebe, such as secreting his books, taking notes of
customers dated anterior to February 4, 1891, etc.   These
acts, however, are not shown to have been known to, or
countenanced by, any one connected with the banking com-
pany and hence, in any view, are immaterial as respects
that company.

The evidence, aside from the disproportion alleged be-
tween the value of the goods and property mortgaged and
the debt secured thereby, by which it is claimed that the
existence of a fraudulent intent on the part of the mort-
gagee was established, has been fully set out, even to te-
diousness, that it may appear how unsatisfactory was this

part of this proof. There was due the banking company the full amount for which security was taken. There was no secret trust. As soon as practicable after the execution of the chattel mortgage possession thereunder was taken and thenceforward retained. The evidence of Mr. Coggeshall, while it intimated that there existed a secret purpose in making the mortgage, aside from securing the amount due from Mr. Wiebe, disclosed no fact or utterance showing that any of the officers of the banking company was aware of such purpose. It is probable that Mr. Wiebe and Mr. Coggeshall, after the fruitless application to the cashier for a further advance of $5,000, in view of the conference which was appointed to be had in the evening, considered various plans which might be advantageous to Mr. Wiebe. This practically was what Mr. Coggeshall's testimony amounted to, and this theory is rendered probable by the promptness with which there was advanced at the meeting, first, a proposition that Wiebe should take Coggeshall's notes on long time for his stock, with the approval of the bank, followed, when rejected, by another proposition, which was that the banking company itself should purchase. Since each of these was declined, the banking company, so far as the evidence shows, was free from any participation in the plans or purposes of Mr. Wiebe and Mr. Coggeshall. Mr. Coggeshall's version of what was said by Mr. Packer, as has been already intimated, was not very clear. Mr. Coggeshall's exact language was:

The principal thing he said was—he told how they treated a creditor of theirs back in Troy.

Q. What did he say?

A. He said a fellow failed and they took possession of what he had, and that in ten days they had a compromise and they had the fellow on his feet again. That was the sum and substance of it.

Passing over the very evident misuse of the word "cred-

itor" for "debtor" Mr. Packer simply stated, in effect, that
a man failed owing Mr. Packer and someone else, who took
possession of what he had, and in ten days they had a
compromise and the fellow on his feet again.   In the first
place this language does not seem specially to have been
directed to Mr. Wiebe, and, if it was intended as an in-
ducement to Wiebe, it was at variance with the straight-
forward, uncompromising terms proposed and exacted by
Mr. Abbott, who, as all the witnesses concede, had charge
of, and directed the transaction of, this business for the
banking company.   Mr. Wiebe was not sworn, and it was
therefore not shown that he heard this statement of Mr.
Packer.   Of all the witnesses who testified as to the oc-
currences at this meeting, and there were six of them, Mr.
Coggeshall was the only one who mentioned this language.
It would therefore seem that it must not of necessity be
conjectured that Mr. Wiebe heard it, since, apparently, it
was addressed to no one in particular.   The other remark
of Mr. Packer, that that was as clean a transaction as he
ever saw in his whole life, if accepted literally, was proof
of the absence of fraud rather than its existence.   The as-
sumption that it was spoken ironically could be entertained
only upon the hypothesis that the transaction was so
obviously corrupt that therefrom the irony would be appar-
ent.   Whether or not corruption existed is the very ques-
tion to be determined, hence this language does not aid
our investigation.   The existence of an unrecorded mort-
gage to secure advances to be made to Mr. Wiebe for two
years previous to the date whereon the new mortgage was
executed was an unusual circumstance.   The failure to re-
cord an instrument of this kind impairs its operation to
the extent prescribed in section 16, chapter 73, Compiled
Statutes, which is in the following language:

   "Sec. 16. All deeds, mortgages, and other instruments
of writing which are required to be recorded, shall take
effect and be in force from and after the time of delivering

the same to the register of deeds for record, and not before, as to all creditors and subsequent purchasers in good faith without notice; and all such deeds, mortgages, and other instruments shall be adjudged void as to all such creditors and subsequent purchasers without notice, whose deeds, mortgages, and other instruments shall be first recorded; *Provided,* That such deeds, mortgages, or instruments shall be valid between the parties."

The record of an instrument of the character above in_ dicated is to impart notice of its existence. It might be that the withholding from record of a mortgage of real property would be so obviously part of a plan to deceive that greater force should be imputed to it than prescribed by the section just quoted. No such condition is, however, found in this case. It is true Mr. Wiebe's misrepresentations as to the unincumbered condition of his property were to some extent rendered plausible by the absence from the record of his mortgage. But this action was in no way founded upon such mortgage. The banking company was not aware, so far as the evidence shows, that Mr. Wiebe was making statements which ignored the existence of its mortgage. If it had been and nevertheless had taken no steps to correct the misinformation given by Mr. Wiebe in his efforts to establish his right to credit, the banking company might have been estopped, as against parties so deceived, from asserting its mortgage. But this would have been on the theory that the banking company was, in effect, a participant in the deception practiced. No case has come within our knowledge which holds that the mere failure to file a mortgage for record raises a presumption· that such mortgage is void, and nothing short of this would sustain the contention of the appellees. It is quite possible that each member of the firm of Abbott & Caldwell may have manifested too much interest in the affairs of Mr. Wiebe after his store had been closed. In none of these transactions, however, did either of these gentlemen assume to

act for the banking company. They, as attorneys at law, accepted of business tendered by Mr. Wiebe, and, that they might be paid therefor, obtained his confession of judgment for prospective fees. They also acted for some of his creditors in obtaining judgment against him by confession, and thereon procured to be made certain so-called levies of executions subject to the mortgage of the banking company. Whatever of impropriety there may have been in any of these proceedings was chargeable individually to Messrs. Abbott & Caldwell, as attorneys at law, and was in no way imputable to the banking company, which was a corporation exclusively engaged in the business of banking.

From the unsubstantial character of the above evidence it is quite apparent that the finding that the chattel mortgage was invalid was based upon other facts than those above discussed. At the time of the entry of the decree in the district court (November 15, 1892) there had, within a comparatively recent time, been delivered by this court certain opinions which were generally understood to have established the doctrine that the mere fact that the value of the property mortgaged was in excess of the amount secured, with probable depreciations in value and such costs and outlays as must necessarily be expended in making collection from the security pledged, *ipso facto*, invalidated the mortgage. Doubtless this understanding of the doctrine established by this court was largely responsible for the finding adverse to the validity of Wiebe's chattel mortgage to the banking company. Mr. Coggeshall, a witness for the defendants, estimated the actual value of Mr. Wiebe's stock on February 4, 1891, at $37,000. The invoice of date February 1, 1891, showed its value was $43,000. Mr. Coggeshall's testimony was that it sold to the very best advantage as it was sold, and that $23,700, the amount actually paid on foreclosure sale, was all that at such sale it could reasonably be expected to bring.

There was evidence that the value of the real property mortgaged contemporaneously with the chattels was $8,000, so that, if this sum is added to the price for which the goods sold ($23,700) the real and personal property actually mortgaged was of a value about double the amount thereby secured. Under these conditions the opinions in the cases of *Bonns v. Carter*, 22 Neb., 517, filed in the July term, 1887, *Morse v. Steinrod*, 29 Neb., 108, filed March 11, 1890, *Brown v. Work*, 30 Neb., 800, filed November 25, 1890, and *Thompson v. Richardson Drug Co.*, 33 Neb., 714, filed January 5, 1892, without doubt greatly conduced to the defeat of the banking company's mortgage in the district court. Of the above cases, *Bonns v. Carter* was expressly overruled in *Jones v. Loree*, 37 Neb., 816, filed October 4, 1893. The right of a debtor in good faith to prefer certain *bona fide* creditors to the exclusion of others, unless perhaps with the above exceptions, has been uniformly recognized by this court. (*Lininger v. Raymond*, 12 Neb., 19; *Grimes v. Farrington*, 19 Neb., 48; *Nelson v. Garey*, 15 Neb., 531; *Bierbower v. Polk*, 17 Neb., 268; *Costello v. Chamberlain*, 36 Neb., 45; *Kilpatrick-Koch Dry Goods Co. v. McPheely*, 37 Neb., 800; *Jones v. Loree*, 37 Neb., 816; *Farwell v. Wright*, 38 Neb., 445; *Kavanaugh v. Oberfelder*, 37 Neb., 649; *Sherwin v. Gaghagen*, 39 Neb., 238; *Hewitt v. Commercial Nat. Bank*, 40 Neb., 820.)

In the case of *Kilpatrick-Koch Dry Goods Co. v. McPheely*, *supra*, the following language was used: " We are not prepared to say that a mortgage would be fraudulent solely because the value of the property mortgaged was two or even three times greater than the debt. Whether it would be, would be a question of fact for a jury or trial court, and not a question of law. A debtor has a right to prefer his creditors; to pay part in full to the exclusion of others, and he has a right to secure the debts of a part of his creditors to the exclusion of the others; and this is true whether he be insolvent, or in failing circum-

stances, or not.   All that the law requires of him is that he should act honestly ; that his disposition of his property should not be made for the fraudulent purpose of hindering, delaying, or defrauding his creditors; and whether an act of a debtor in the disposition of his property was fraudulent, is always a question of fact and not a question of law.   Section 20, chapter 32, Compiled Statutes, provides : 'The question of a fraudulent intent   *   *   *   shall be deemed a question of fact and not of law.' "

In an opinion prepared by IRVINE, C., in the case of *Kilpatrick-Koch Dry Goods Co. v. Bremers*, 44 Neb., 863, filed at this term, another phase of this question was under consideration, and the history of the decisions of this court in connection therewith were fully considered, closing with the following language : " If we should hold that the taking or giving of inadequate security constituted the transaction fraudulent, we would practically hold that a debtor could never safely secure his creditor.   The argument has always been the other way, and it has often been said that the giving and taking of security in value greatly in excess of the debt is evidence tending to prove fraud.   It would not do to say that because a debtor cannot give adequate security he must refrain from giving any, or leave the transaction open to attack as constituting a fraud in law."

As was pointed out in *Kilpatrick-Koch Dry Goods Co. v. McPheely, supra*, the statute of this state therein referred to provides that the question of fraudulent intent shall be deemed a question of fact and not of law.   This statutory provision directly negatives the proposition that from the taking of security in excess of the amount to be secured the law implies a fraudulent intent.   As pointed out by Commissioner IRVINE, the disproportion, if one exists, is but a matter of evidence, to be given such consideration as in the light of surrounding circumstances it may be entitled to receive in determining a question of fact.   We cannot believe that with this proposition considered as above indi-

cated there was sufficient evidence to sustain the finding that the chattel mortgage made by Mr. Wiebe to the Grand Island Banking Company was fraudulent or invalid. It follows as a consequence of this view that the costs and expenses of foreclosing plaintiff's chattel mortgage should be allowed, since they were provided for by the terms of the mortgage. There was evidence that this amount was $883.85, but in the supplemental petition the amount was fixed at but $866.35, which must control. We conclude, therefore, that, inferior only to the claim established for taxes, the Grand Island Banking Company is entitled to receive payment of the amount secured by its chattel mortgage at the date of the foreclosure sale, and the sum of $866.35, expenses incidental to such foreclosure, and that after such payments have been deducted the remaining funds derived from said foreclosure sale, and the collateral notes and the collections therefrom made by said banking company, should be applied upon the claims of other creditors of Charles A. Wiebe in the same order of priority, between themselves, as was decreed in the district court, and that the Grand Island Banking Company should recover its costs. That a decree may be entered in this case conformably to the views above expressed the judgment of the district court is reversed.

REVERSED AND REMANDED.

HARRISON, J., not sitting.